## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **XUEYAN ZHOU A/K/A SUSAN ZHOU,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| **vs.** | ) | **5:17-cv-01033-AKK** |
| | ) | |
| **INTERGRAPH CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

Xueyan Zhou alleges that her former employer, Intergraph Corporation, unlawfully subjected her to a hostile work environment, discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. Doc. 1. The court has for consideration Intergraph's motion for summary judgment, which is fully briefed and ripe for consideration. Docs. 25, 31, 33. After reading the briefs, reviewing the evidence, and considering the relevant law, the court finds that Intergraph has sustained its burden only as to Zhou's claims for sex discrimination, race and national origin discrimination, and racial harassment. Therefore, Intergraph's motion is due to be granted in part and denied in part.

# I.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original).

The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (internal quotations omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At summary judgment, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255. Any factual disputes will be resolved in the non-moving party's

favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## II.    FACTUAL BACKGROUND

### A. <u>Zhou's Work at Intergraph</u>

Intergraph employed Zhou as a software consultant from May 2011 until February 2017. Doc. 26-1 at 48-50. Zhou's work consisted primarily of programming at the user interface level or "client tier" for a 3D software product called SmartPlant 3D ("S3D"). Docs. 26-3 at 20; 26-6 at 43-44. However, Zhou also studied the middle level coding language of C++ in school, and was learning the lower level code of WPF prior to her discharge. Doc. 26-1 at 81-82. While at Intergraph, Zhou worked on one particular project that involved coding on multiple "tiers" and received positive feedback from her supervisor Steve Herold and the client. Doc. 26-1 at 161-63. Zhou also received positive annual performance

reviews that she was either "meeting" or "exceeding" expectations from her supervisors Lester Lynd (2011 - 2014) and Herold (2014 - 2017). Docs. 26-1 at 60, 62, 67, 83, 89; 26-6 at 13, 40. In these reviews, Lynd and Herold encouraged Zhou to continue developing her skills and to "focus on learning about the middle tier components" of the S3D product. *See* doc. 26-1 at 141, 154, 172, 192; 26-2 at 17.

### B. <u>The Harassing Conduct</u>

After becoming Zhou's immediate supervisor, Herold met with Zhou in December 2014, during which he told Zhou that he had power, that he knew how much people on his team made, that he had the right to put people "in their bracket," and that he had the power to pick who to add to "the layoff list." Doc. 26-1 at 116, 126-27. Herold added that if Zhou did not "do what he said," he would add her to this "layoff list." *Id*. at 116. Herold then made these same threats to Zhou in another conversation. *Id*. at 126. It is unclear what specific actions Herold asked Zhou to undertake, but Zhou did not interpret Herold's demands as sexual in nature and she acknowledges they could have been work-related. *Id*. at 118-21.

Zhou complained to Lynd (Herold's supervisor) about Herold's threats on at least two occasions. *Id*. at 241. Zhou asked Lynd if she could transfer to another group, *id*. at 116-17, in one or perhaps both of these conversations. When Lynd asked why, Zhou relayed her conversation with Herold and expressed her concern that Herold was threatening her. *Id*. at 126-27. Lynd told Zhou that "[Herold]

would not say that," that there was no "layoff list," and that Herold would not retaliate against her. *Id*. at 126-27, 117, 122. After this conversation, Lynd told Herold that Zhou had complained to him about Herold's "layoff list" comments. Doc. 26-6 at 65. Subsequently, Herold had a follow-up conversation with Zhou, the details of which are unclear. Doc. 26-1 at 123. Zhou decided not to pursue her transfer request. *Id*. at 123.

Over the course of the next three-to-four years, Herold engaged in various conduct that made Zhou uncomfortable and that she interpreted as sexual overtures. *Id*. at 174, 240-41. For example, Herold repeatedly (less than ten times) told Zhou at various times that his wife was out of town, that he was a bachelor, and that he was "free." *Id*. at 143-46. Additionally, on multiple occasions, Herold told Zhou that she dressed "very nice," a comment which Lynd also repeatedly made to Zhou. *Id*. at 233-234. On two occasions, once while alone and a second time when others were present, Herold told Zhou that a female employee had seduced him by sitting next to him in his office and touching her leg against his, and that he had had an affair with this employee. *Id*. at 233, 237-38. Once, when Herold was using his phone to show Zhou photos of his grandchild, Herold displayed a photo of his daughter breastfeeding with her chest exposed. *Id*. at 150-52. Then, Herold told Zhou that he had found a "bloody picture" of his wife delivering a child and tried to show her that picture as well, but Zhou turned away.

*Id.* at 153-54. Finally, in March 2016, Herold visited Zhou at her home one Sunday afternoon to give her a casserole while she was recovering from a car accident and while her husband was out of town. *Id.* at 168-73. Herold stayed for a few minutes, made no inappropriate comments, and then left. *Id.* at 172-74. However, Herold apparently pressured Zhou into allowing him to eat dinner with her and only left when Zhou invited her daughter to meet him. *Id.* at 172-74.

With the exception of the "layoff list" conversation she reported to Lynd, Zhou did not report any of Herold's behavior to anyone at Intergraph prior to her termination, and also did not report Lynd's comments. *Id.* at 245.[1] Zhou acknowledges that she had reviewed and was familiar with Intergraph's anti-harassment policy and complaint procedure. *See* 26-1 at 53-56, 128-29, 132-33; 26-4; 26-5.

_____

[1] Zhou contends in her brief that she told Kaplan that she was uncomfortable around Herold. Doc. 31 at 15 (citing doc. 26-1 at 106, 242). The relevant portion of Zhou's testimony states:

> Q. And you've testified that you complained to Jennifer Kaplan about Mr. Herold. What did you complain to her about?
> A. I testified, 'Jennifer, I feel unsafe after the bathroom incident, and also uncomfortable to Steve Herold.' I said, 'I don't feel safe to come work, because if we don't find this person, today they put this on the wall, tomorrow they may physically attack me.' That's I'm feared of every day come to work.

Doc. 26-1 at 241-242. However, Zhou clarified subsequently that she never reported Herold's sexual harassment to Lynd or Kaplan and that, when she spoke with Kaplan about an incident involving bathroom graffiti, she did not mention anything about Herold. Doc. 26-1 at 244. Thus, although, "[a]s a general principle, a plaintiff's testimony cannot be discounted on summary judgment," the court discounts Zhou's testimony that she told Kaplan, at some point, "I feel . . . uncomfortable to Steve Herold" because this testimony is "blatantly contradicted by the record" and is "blatantly inconsistent" with her other testimony. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253-54 (11th Cir. 2013).

## C. **<u>The Graffiti Incident</u>**

On December 20 or 21, 2016, a co-worker, Luther Walke, told Zhou about graffiti in a men's restroom that referred to Zhou and three other employees. *Id*. at 92-94. The graffiti said "Asian Sluts" above a list of four names that included Zhou's first name, Susan, and the first names "Nancy," "Joseph," and "Luther," with lines connecting the two females to the males. *Id*. at 95-97; doc. 26-8. Both Zhou and Jennifer Kaplan, the vice president of human resources, believed that "Nancy" in the graffiti referred to Nancy Ma, a Chinese employee, and that the males referenced were Joseph Harrison and Luther Walke, neither of whom are of Asian descent. Docs. 26-1 at 92-97; 26-7 at 17.

Upon learning about the graffiti, Denise Bates, the facilities manager, temporarily taped chart paper over the graffiti and later ripped out the wallpaper. Doc. 26-7 at 18-19. Bates also called the police, and either Bates or Kaplan filed a police report. Docs. 26-7 at 18; 26-1 at 100. Subsequently, Bates provided Kaplan with employee badge access information to review, and told Kaplan that she had reviewed this information herself. Doc. 26-7 at 20-22.

When Kaplan and Walke called Zhou to talk about the graffiti, Zhou told Kaplan, "I don't feel safe to come work, because if we don't find this person, today they put things on the wall, tomorrow they may physically attack me." Doc. 26-1 at 92-93, 242. Zhou also told Kaplan that she felt nervous and uncomfortable walking

around the parking lot. Doc. 26-7 at 24-25. Ostensibly for the purpose of investigating the incident, Kaplan also asked Zhou who she talked to at the office and Zhou named three men. Doc. 26-1 at 102-03.

After returning to the office from traveling during the winter holidays, Zhou asked Kaplan for an update. Doc. 26-1 at 108. During this conversation, Kaplan asked Zhou to help her review the badge access information from the date of the incident, *id.* at 105-06, and told Zhou that the detective assigned to the case did not have time to work on it, *id.* at 108. Zhou then called the assigned detective, who told Zhou that he had called Kaplan three times and left voicemails, that Kaplan never returned his calls, and that he had dismissed the case. *Id.* at 108-09.

As for the investigation, although Kaplan reviewed the badge access information, she did not interview any employees. Doc. 26-7 at 22. Also, perhaps because there were no security cameras installed outside the bathroom or because she did not believe such a review would prove useful, Kaplan did not review any of the footage from other cameras installed around the building. Doc. 26-7 at 23, 27. Ultimately, Intergraph did not identify the person(s) responsible for the graffiti. *Id.* at 25.

### D. <u>The Transfer Interview</u>

About a month after the graffiti incident, Lynd's manager, Bucky Howell, suggested to Lynd that Zhou should interview for a position with the "BIM" team.

Doc. 26-3 at 20. Lynd then spoke to Herold about the "BIM" position based on Lynd's contention that he wanted Zhou to interview for the "BIM" team because Zhou was "more of a user interface programmer," and the type of work that she was doing on her S3D core team "had exhausted mostly." *Id*. at 20-21. As for Herold, he claims that he supported Lynd's suggestion because Zhou lacked "good skills doing lower level tasks" and "she was the lowest performing member of [his] team." *Id*.

Subsequently, Herold told Zhou that Intergraph had chosen her to interview for a position on the "BIM" team. Doc. 26-1 at 178-80. Zhou asked if the directive to interview for this transfer (which could have been local or to France) was related to the graffiti incident, stating that, "I'm the victim. I shouldn't get transferred, I should get protected." *Id*. at 178. Herold responded that she had to interview. Later, Zhou asked Lynd the same question and stated, "I'm the victim." *Id*. at 205. Lynd denied that the incident factored in the decision, stated that Zhou was doing a good job, and that he wanted her "skill to help other team [sic] as well." *Id*. Ultimately, the "BIM" team did not select Zhou for the vacancy. *Id*. at 181-82.

## E. Zhou's Termination

A few weeks later, on February 7, 2017, Intergraph discharged Zhou due purportedly to a reduction in force dictated by economics. Doc. 26-3 at 34. In response, Zhou informed Lynd and Tara Argraves, a Human Resources employee,

for the first time about Herold's alleged sexual harassment, including Herold's visit to her home, the photos of breastfeeding and childbirth, and the comments about his wife being out of town and about being seduced by an employee. *Id*. at 29, 35-36; doc. 26-1 at 131. When Lynd asked Zhou why she had not reported this conduct prior to her termination, Zhou cited Herold's age and her desire not to hurt him. *Id*. at 133.

As for the termination, Intergraph maintains that the President and CFO of its parent company, Hexagon, decided to reduce the workforce based on the economic outlook of the oil and gas sector. Doc. 26-7 at 28. According to Intergraph, when Howell informed Lynd that the S3D organization needed to decrease its resources, Lynd selected Zhou for discharge because her skills were no longer compatible with her team. Doc. 26-3 at 12, 24. Allegedly, Zhou's lack of skills was "an ongoing issue" that stretched back to when Lynd supervised Zhou. *Id*. Lynd maintains that he chose Zhou for discharge without any input from Herold. Doc. 26-3 at 41. However, Lynd acknowledges also that he and Herold had regular conversations in which they ranked the performance of the employees on Herold's team. Doc. 26-6 at 18, 25.

## III.   ANALYSIS

Zhou asserts Title VII claims for sexual harassment, racial and national origin harassment, retaliation, discrimination based on sex, and discrimination

based on race and national origin. *See* doc. 1. Title VII makes it unlawful "to discharge . . . or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Harassment based on race, sex, or national origin can constitute discrimination "because of . . . race, . . . sex, or national origin" for purposes of Title VII. *See id*; *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 508 (11th Cir. 2000); *Herawi v. State of Ala. Dep't of Forensic Sciences*, 311 F. Supp. 2d 1335, 1350 (M.D. Ala. 2004). Title VII also has a retaliation provision that creates a cause of action for employees who are discriminated against for engaging in protected activity. 42 U.S.C. § 2000e-3; *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994).

### A. Sexual Harassment

Zhou contends that Intergraph subjected her to a hostile work environment based on sex and discharged her because she rejected her supervisor's sexual advances. *See* doc. 31 at 17-22. To establish a *prima facie* case, Zhou must show:

> (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists.

*Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004) (citing *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)). The Eleventh Circuit has referred to these elements as the "*Mendoza* factors." *See*, *e.g.*, *Johnson*, 234 F.3d at 508 n. 7. For the fifth factor, in order to establish a basis for the employer's liability, a plaintiff may rely on two theories of liability: a "tangible employment action" theory and/or a "hostile work environment" theory. *See Hulsey*, 367 F.3d at 1245-46; *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 n.7 (11th Cir. 2000).[2]

District courts must evaluate liability according to the *Mendoza* factors regardless of the theory of liability. *See Johnson,* 234 F.3d at 508 n. 7. Moreover, the plaintiff may rely on both theories for the same alleged conduct, as Zhou does here. *See Hulsey*, 367 F.3d at 1246. Nonetheless, there is a crucial difference regarding the application of the fourth *Mendoza* factor depending on whether a plaintiff is proceeding under a hostile work environment or a tangible employment action theory: "[I]f a supervisor retaliates against a worker for failing to give in to sexual advances, those advances will rise to the level of 'severe or

---

[2] The Eleventh Circuit has described the difference between the two theories as follows: "To prove sexual harassment in violation of Title VII, a plaintiff may rely on one of two theories. Under the first theory, the plaintiff must prove that the harassment culminated in a 'tangible employment action' against her. Under the second or 'hostile work environment' theory, the plaintiff must prove that she suffered 'severe or pervasive conduct.' " *Cotton v. Cracker Barrel Old Country Store,* 434 F.3d 1227, 1231 (11th Cir. 2006) (citations omitted).

pervasive.'" *Johnson,* 234 F.3d at 508 n. 7. Thus, under the tangible employment action theory, whether a plaintiff satisfies the fourth and fifth *Mendoza* factor collapses into one inquiry: whether there is a basis for holding the employer liable because a supervisor took tangible employment action against the plaintiff for failing to comply with the supervisor's sexual demands. *See id.*; *Hulsey*, 367 F.3d at 1246 ("When we talk about tangible employment action and hostile environment, what we are or should be talking about are the two alternative ways a plaintiff may establish a basis for the employer's vicarious liability, which is the fifth factor of a Title VII sexual harassment claim."). Whether the supervisor's alleged harassment was of a frequency, degree, and nature that would qualify as "severe and pervasive" is irrelevant. *See id*. at 1246-48 (analyzing the frequency, severity, and nature of the alleged sexual harassment only when assessing the plaintiff's claim under a hostile work environment theory, but not when assessing her claim under a tangible employment action theory).

Turning now to the specifics here, Intergraph contends that Zhou cannot meet her burden with respect to the third, fourth, and fifth *Mendoza* factors. Doc. 25 at 15-23. The court will address these factors separately below.

### 1. Whether the Harassment Was Based on Sex.

To show that harassment was "based on her sex," Zhou "must show that but for the fact of her sex, she would not have been the object of harassment."

*Mendoza*, 195 F.3d at 1248 n.5. Workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 81. Moreover, "general vulgarity or references to sex that are indiscriminate in nature will not, standing alone, generally be actionable." *Reeves v. C.H. Robinson Worldwide Inc*., 594 F.3d 798, 809 (11th Cir. 2010). However, when a person "makes comments or advances of an erotic or sexual nature," the court can infer that "the harasser [is making] advances towards the victim because the victim is a member of the gender the harasser prefers." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 (11th Cir. 1998). The court considers evidence of harassment "both cumulatively and in the totality of the circumstances," with "[c]ommon sense, and an appropriate sensitivity to social context." *Reeves*, 594 F.3d at 808, 812 (citing *Mendoza*, 194 F.3d at 1242 and *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

Although some of the alleged conduct cannot constitute sexual harassment—Herold's "layoff list" threats to Zhou and Lynd's comments that Zhou dressed "very nice"—as the record does not support a finding that these comments were made because of Zhou's sex, the record is replete nonetheless with comments that permit the inference that Zhou was subject to harassment based on her sex. Specifically, several instances of Herold's conduct toward Zhou, when considered

cumulatively, could be interpreted as "comments or advances of an erotic or sexual nature." *See Llampallas*, 163 F.3d at 1246. These include: (1) Herold's repeated remarks to Zhou that his wife was out of town, that he was a "bachelor," and that he was "free"; (2) Herold's comments to Zhou that he was seduced by a female employee who touched her leg against his; (3) Herold's comments to Zhou on multiple occasions that she dressed "very nice"; and (4) Herold's visit to Zhou's home, unsolicited, to give her a casserole, during which he pressed her to let him stay for dinner. Based on Herold's sexual overtures to Zhou, "common sense" dictates that he engaged in this behavior based on Zhou's sex. *See Reeves*, 595 F.3d at 811 (quoting *Oncale*, 523 U.S. at 82).

Likewise, the anonymous "Asian sluts" bathroom graffiti also constitutes harassment based on sex. The epithet has a sufficiently "sex-specific and derogatory" meaning "as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." *See Oncale*, 523 U.S. at 80; *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1302 (11th Cir. 2007) (noting that a supervisor's use of the word "slut" to describe a female subordinate was, when compared to his other profanity, "more sex specific, which is to say more degrading to women than to men."). Indeed, this inference is strengthened by the fact that the two female employees apparently targeted by the graffiti were Asian, whereas the two male employees were not, suggesting that

"Asian sluts" referred to the women. *But see Reeves*, 594 F.3d at 813 (finding that coworkers' use of the terms "bitch" and "whore" were sexual harassment even though the terms were directed at both men and women).

## 2. Whether the Harassment Amounted to Severe or Pervasive Conduct.

Under a hostile work environment theory, Zhou must show that the sexual harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment." *See Hulsey*, 367 F.3d at 1244 (citations omitted). The "severe or pervasive" standard has both subjective and objective components: the plaintiff must "'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Mendoza*, 195 F.3d at 1246 (quoting *Harris v. Forklift Systems, Inc*. 510 U.S. 17, 21-22 (1993)). In other words, the "objective severity" of the harassment must be such that a reasonable person in the plaintiff's position, considering all the circumstances, would find the environment "hostile or abusive." *Id*. (quoting *Oncale*, 523 U.S. at 81 and *Harris*, 510 U.S. at 21). In determining whether the harassment rises to this level, the court must consider four factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Harris*,

510 U.S. at 23. Though all of these factors should be taken into account, "no single factor is required." *Id.* Finally, in making this determination, the court can only consider instances of harassment that were based on sex. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *overruled on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) ("[S]tatements and conduct must be of a sexual or gender-related nature—'sexual advances, requests for sexual favors, [or] conduct of a sexual nature'—before they are considered in determining whether the severe or pervasive requirement is met." (citation omitted)).

Here, the discriminatory harassment that Zhou cites amounts to approximately fifteen instances over the course of three-to-four years, which is too infrequent under Eleventh Circuit case law to qualify as pervasive. *See*, *e.g.*, *Guthrie v. Waffle House*, 460 F. App'x 803, 807 (11th Cir. 2012) (finding that "a few dozen comments or actions . . . spread out over a period of eleven months" was insufficiently frequent); *Mitchell v. Pope*, 189 F. App'x 911, 913 (11th Cir. 2006) (finding that "16 specific instances of offensive conduct" over four years was insufficiently frequent). However, viewing the evidence in the light most favorable to Zhou, the alleged conduct was sufficiently severe as it included "many direct as well as indirect propositions for sex." *Hulsey*, 367 F.3d at 1248. While Herold may not have explicitly solicited sex from Zhou, his references to an affair with a subordinate and his many comments about his wife being out of town and

his resulting bachelor status clearly conveyed his intent. On the alleged facts, requiring an explicit proposition in order to find that Herold's conduct was severe would ignore the reality of the alleged behavior and would make a mockery of the anti-harassment laws.

### 3. Whether the Harassment Culminated in Zhou's Termination.

Alternatively, even if Intergraph is correct that the alleged conduct is not severe and that consequently Zhou cannot establish her sexual harassment claim under a hostile work environment theory, that does not end the court's inquiry: the court must also consider whether Zhou's "refusal to submit to a supervisor's sexual demands result[ed] in a tangible employment action being taken against her." *Hulsey*, 367 F.3d at 1245. A "tangible employment action" includes "a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. (internal quotations omitted) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998)). "There also must be a causal link between the tangible employment action and the sexual harassment." *Cotton*, 434 F.3d at 1231-32. An inference of causation arises where "the harasser was the decision-maker for the tangible employment action." *See Llampallas*, 163 F.3d at 1247. However, where the harasser was not the decision-maker, "a 'cat's paw' theory of recovery may apply when a biased actor recommends that an adverse employment action be taken

against an employee, but the biased actor is not the ultimate decision-maker." *Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 F. App'x 936, 938 (11th Cir. 2010) (citing *Stimson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)).

Intergraph maintains that the alleged harassment did not result in a tangible employment action because Lynd made the discharge decision without any input from Herold. Doc. 33 at 5-6. Zhou counters that Lynd's decision may have been based on Herold's opinion. Doc. 31 at 29.[3] The record, when viewed in the light most favorable to Zhou, supports Zhou's cat's paw theory. It is undisputed that Lynd last directly supervised Zhou in 2014—three years before the discharge. Thus, an issue of fact exists regarding whether Lynd had current and independent knowledge of Zhou's abilities and skills. Indeed, Lynd admits that he had regular conversations with Herold in which they discussed and ranked employees' performances. In other words, Lynd was likely aware of Herold's opinion that Zhou was "the lowest performing member of [Herold's] team," *see* doc. 26-6 at 18, 25, 43, when he made the discharge decision. These conversations occurred as recently as a few weeks before the termination, when Herold shared his assessment about Zhou's abilities as part of the discussion on whether Lynd should suggest

---

[3] Intergraph contends that Zhou's sexual harassment claim fails because Herold never "requested a sexual favor, or even asked Zhou out on a date." Doc. 33 at 6. However, "a victim need not provide evidence of a direct and express sexual demand to make a claim under the 'tangible employment action' analysis." *Frederick v. Sprint/United Mgmt. Co.,* 246 F.3d 1305, 1312 (11th Cir. 2001). The evidence of Herold's sexual advances toward Zhou is sufficient to raise a genuine issue. *See supra* Section III-A-1.

that Zhou apply for a transfer. A few weeks later, Lynd allegedly decided to discharge Zhou for that same reason, which suggests that Herold's opinions about Zhou that he regularly shared with Lynd influenced Lynd's decision. *See* docs. 26-3 at 11-12, 19-21; 26-6 at 43-44. Thus, in light of the evidence that Lynd relied on Herold's characterization of Zhou's skills when he decided to discharge her, coupled with Herold's threats to Zhou about his power over the layoff list, the court cannot find as a matter of law that Herold had no involvement in the discharge decision. The court finds instead that, when the evidence is viewed in the light most favorable to Zhou, a genuine issue of material facts exists regarding whether Zhou's refusal to submit to Herold's advances resulted in the tangible employment action. For these reasons, summary judgment on Zhou's sexual harassment claim is due to be denied.

### B. **Harassment Based on Race and National Origin**

Based on the "Asian sluts" graffiti incident, Zhou also contends that Intergraph subjected her to harassment based on her race and national origin as a person who was born in China and is of Chinese descent. Docs. 1 at 6-7; 31 at 7. This single incident, while reprehensible, does not rise to the level of "severe and pervasive" conduct necessary to establish a hostile work environment. *See Adams v. Austal, U.S.A., L.L.C*, 754 F.3d 1240, 1254 (11th Cir. 2014) (finding that conduct was not "severe or pervasive" where African-American plaintiff "saw

racist graffiti in the men's restroom that he used on a daily basis," "saw his coworkers wear the Confederate flag on a regular basis," "heard people say the slur 'n*****'" several times, and heard about a noose being left in the breakroom). Moreover, while Intergraph perhaps could have done more to attempt to identify the perpetrator, it still responded to the incident with "immediate and appropriate corrective action" that was "reasonably likely to prevent the misconduct from recurring." *See Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1260-61 (11th Cir. 2003); *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).[4] Thus, Zhou's claim of hostile work environment based on race and national origin fails.

## C. Retaliation

Zhou contends that Intergraph retaliated against her by terminating her after she complained about and participated in the investigation of the graffiti incident.

---

[4] After the graffiti was discovered, the facilities manager promptly covered and then removed the wallpaper containing the graffiti, and Intergraph filed a police report. Docs. 26-7 at 18; 26-1 at 100; 26-6 at 34-35. Kaplan, the Vice President of Human Resources, also reviewed the employee badge access logs, discussed these logs with the facilities manager, and spoke with the police, who informed Kaplan that, "short of doing an interrogation of all of our employees," it was unlikely that Intergraph would figure out who wrote the graffiti. *Id.* at 21-24. Notably, Kaplan did not conduct any employee interviews or review any of the video footage. *Id.* at 27. Moreover, there were no security cameras outside the bathrooms, and Intergraph still had not installed security cameras over a year after the incident. *Id.* at 19. Nevertheless, "[a]ll that is required of an investigation is reasonableness in all of the circumstances, and the permissible circumstances may include conducting the inquiry informally in a manner that will not unnecessarily disrupt the company's business[.]" *Baldwin*, 480 F.3d at 1304. The record here demonstrates that, while Intergraph's investigation was lacking in certain respects, it was adequately prompt and reasonable under the circumstances to satisfy Intergraph's obligations to its employees.

Doc. 31 at 23-26. Where the evidence of retaliation is entirely circumstantial, the burden of proof shifts between the plaintiff and defendant according to the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972), analytical framework. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). Initially, the plaintiff must show: (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that the adverse employment action would not have occurred but for the protected activity. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "proffer a legitimate, non-discriminatory reason for the adverse employment action," but this burden is "exceedingly light." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1495 (11th Cir. 1989)). If the defendant does so, "[t]he plaintiff must then demonstrate that the employer's proffered explanations are a pretext for retaliation." *Id.*

With respect to the first prong of the *prima facie* case, Zhou contends that her participation in Intergraph's internal investigation of the graffiti, by itself, constitutes protected activity under Title VII. Doc. 31 at 23-24. However, that is not the case because "[t]he 'participation clause' only 'protects proceedings and activities which occur in conjunction with or after the filing of a formal charge

with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC.'" *Cheatham v. Dekalb Cty., Ga.*, 682 F. App'x 881, 886 (11th Cir. 2017) (quoting *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2001)).

Still, Zhou can show that she engaged in protected activity: (1) when she complained to Kaplan that the "Asian sluts" graffiti made her feel unsafe and uncomfortable; (2) when she asked Herold if she was being instructed to interview for a transfer because of the graffiti incident and stated she was a "victim" who should be "protected"; and (3) when she asked the same question of Lynd and said she was a "victim." *See* docs. 26-1 at 178, 204-05, 242; 26-7 at 24-25. In light of the racially and sexually discriminatory content of the graffiti, Zhou's comments to Kaplan, Herold, and Lynd could reasonably be construed as informal complaints of unlawful harassment. *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999) ("An employee is protected from discrimination if (1) '[she] has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) . . ." (quoting 42 U.S.C. § 2000e-(3)a)); *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) (en banc) (noting that Title VII protects individuals "who informally voice complaints to their supervisors"). Furthermore, Zhou can show that she reasonably believed that the "Asian sluts" bathroom graffiti constituted sexual or racial harassment. *See*

*Furcron*, 843 F.3d at 1311 ("The conduct opposed need only be close enough to support an objectively reasonable belief that it is [unlawful]." (citation and quotation marks omitted)). Thus, Zhou has established that she engaged in statutorily protected expression.

Zhou can also satisfy the second and third prongs of her *prima facie* case by showing that her termination was causally connected to her protected activity. A plaintiff can prove causation through "sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse . . . action." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) (citation omitted). Even if Lynd solely made the decision, at a minimum, Lynd did so within a month of his own conversation with Zhou in which she engaged in protected activity. *See* doc. 26-1 at 204-05. The one-month gap between this conversation and Zhou's termination is sufficiently close to create a presumption of causation. *See*, *e.g.*, *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("We have held that a period as much as one month between the protected expression and the adverse action is not too protracted."). Thus, Zhou can establish a *prima facie* case of retaliation.

Therefore, the burden shifts to Intergraph to articulate a non-retaliatory reason for Zhou's discharge. Intergraph has proffered that it discharged Zhou as

part of a reduction in force necessitated by financial concerns, and that it selected Zhou because her "skill set" was no longer appropriate for her team. *See* doc. 26-3 at 24, 34; 26-7 at 28. Specifically, Intergraph claims that it discharged Zhou because she had primarily performed user interface programming that "had exhausted mostly," and Zhou "was not skilled in coding at the middle and lower levels" of the S3D software. *See* docs. 26-3 at 12, 20, 26-28; 25 at 3, 13. This is sufficient to satisfy Intergraph's burden. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998) (finding that the defendant "need only produce evidence that could allow a rational fact finder to conclude that [plaintiff's] discharge was not made for a discriminatory reason." (citation omitted)).

In light of this, Zhou "must provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for [her] discharge." *Id*. at 1332 (citation omitted). "To show pretext, the evidence produced must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Furcron*, 843 F.3d at 1313 (citation and quotation marks omitted)). Viewed in the light most favorable to Zhou, the record contains sufficient evidence of pretext. As an initial matter, the close temporal proximity of one month between Zhou's complaint to Lynd and her discharge is evidence of pretext. *See Hurlbert v. St.*

*Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). Moreover, Zhou has also presented evidence that Herold, Zhou's alleged sexual harasser, influenced Lynd's decision to discharge Zhou. *See supra* Section III-A-3. And, if that were not enough to raise a genuine dispute, Zhou can also point to evidence that she was a competent, if not commendable, programmer. Over the course of her employment, there is no documentary evidence that Zhou received any complaint or negative report concerning her performance. *See Wascura v. City of South Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001) ("[T]he lack of complaints or disciplinary reports in an employee's personnel file may support a finding of pretext"). Indeed, Zhou's annual performance reviews from 2012 through 2016 consistently note that she "meets expectations" and, in four of the reviews, that she "exceed[ed] expectations" for the categories of "Teamwork" or "Customer Impact/Value Added." Doc. 26-1 at 141-42, 154-57, 172-74, 192-94; 26-2 at 17-19. And, although Intergraph claims that it discharged Zhou because her "skill set was no longer compatible" with her team, doc. 25 at 13, Zhou's performance reviews seem to directly rebut that assertion. For instance, in Zhou's November 2016 review, completed only four months before her discharge, the comments under the category "Job Knowledge/Skills/Capabilities" state that Zhou is "a solid developer" with "a good working knowledge of all the software languages used within the S3D product," and "[s]he is able to leverage her knowledge to achieve

positive results on her assigned projects." Doc. 26-2 at 17. Earlier reviews of Zhou's job skills also offer similar, positive feedback. *See*, *e.g.*, doc. 26-1 at 154 ("Susan is very conscientious that her work is of the highest quality which has led to very low rejection rate of her work items."), 172, 192. Furthermore, Herold's positive feedback for Zhou's work on two particular projects, one of which involved multiple tiers of coding, further undermines Intergraph's proffered reason for discharging Zhou. *See* doc. 26-1 at 160-64.

Taking this evidence into account, a reasonable factfinder could ultimately conclude that Intergraph's proffered reasons were "unworthy of credence." *See Furcron*, 843 F.3d at 1313. Thus, the motion on Zhou's retaliation claim fails.

### D. <u>Sex, Race, and National Origin Discrimination</u>

The motion is due to be granted, however, as to Zhou's claims of discrimination based on her sex, race, and national origin. Zhou abandoned these claims when she failed to address them in her response to Intergraph's motion for summary judgment. *See* docs. 25 at 24-27; 31; *Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 n. 2 (11th Cir. 2009) (citing *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001)) (finding that the plaintiff waived claims he failed to address in his response to the motion for summary judgment).

Alternatively, the discrimination claims fail because Zhou has not shown that Intergraph "treated similarly situated employees who are not members of [her] class more favorably," or that Intergraph "intended to discriminate against [her] in making the discharge decision." *See Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (holding that, to establish a Title VII discrimination claim, a plaintiff must show, in part, that "her employer treated similarly situated employees who are not members of the plaintiff's class more favorably"); *Standard*, 161 F.3d at 1331 (stating that, in a reduction in force case, the plaintiff must show "sufficient evidence from which a rational fact finder could conclude that [her] employer intended to discriminate against [her] in making the discharge decision."). Zhou has presented no evidence that Intergraph treated her less favorably than a similarly situated comparator outside her protected classes. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). Nor does the record present "a convincing mosaic of circumstantial evidence that would allow a jury to infer[] intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citations omitted).

## CONCLUSION

In sum, viewing the evidence in the light most favorable to Zhou, summary judgment is due to be denied on Zhou's sexual harassment claim because she can show that Intergraph subjected her to sexual harassment that culminated in her

discharge. Furthermore, because Zhou can establish a *prima facie* case of retaliation and can show that Intergraph's proffered reasons for the discharge are pretextual, Intergraph's motion is also due to be denied on her retaliation claim. However, Intergraph's motion is due to be granted as to Zhou's claims for hostile work environment based on race and national origin, sex discrimination, and race and national origin discrimination. The court will enter a separate order consistent with these findings.

 **DONE** the 7th day of January, 2019.

<br>

                **ABDUL K. KALLON**
              UNITED STATES DISTRICT JUDGE